**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

DINO DEMARIO, *et al.*

**Plaintiffs**

**v.**                                                      **CIVIL NO.** 16-2897(RAM)

ANTHONY LAMADRID-MALDONADO, *et al.*

**Defendants**

### OPINION AND ORDER

RAÚL M. ARIAS-MARXUACH, District Judge

This matter comes before the Court on co-defendant Puerto Rico Electric Power Authority's ("PREPA") *Motion for Summary Judgment.* (Docket Nos. 252 and 259-1). Having reviewed the parties' submissions, the Court **GRANTS** PREPA's *Motion for Summary Judgment* at Docket No. 252. (Docket Nos. 264, 265, 275, and 276).

### I.   BACKGROUND

Dino DeMario and Cheryl Steele (collectively "Plaintiffs") are the parents of the late Nicholas DeMario. (Docket No. 99 ¶¶ 3-4). On November 1, 2015, Nicholas DeMario was assisting his friends with pushing their vehicle, a Mazda Protege with license plate number 1KG-492, which had suffered a mechanical breakdown on a road in the Municipality of Hormigueros. ("Hormigueros" or the "Municipality"). Id. ¶ 16. Anthony Lamadrid-Maldonado ("Lamadrid") was driving a Mitsubishi Eclipse with license plate number GLG-

871 in the same direction. Id. ¶ 17. Lamadrid's Mitsubishi impacted the rear end of the Mazda and Nicholas DeMario was pronounced dead at the scene. Id.

On October 31, 2016, Plaintiffs filed a lawsuit against Lamadrid, the Puerto Rico Electric Power Authority ("PREPA"), the Puerto Rico Highway and Transportation Authority ("PRHTA"), the Municipality, and unnamed insurance companies, seeking emotional damages as well as medical and funeral expenses caused by the loss of their son. (Docket No. 1). Plaintiffs subsequently filed three (3) amended complaints incorporating as co-defendants various insurance companies. (Docket Nos. 2 ¶ 10; 61 ¶¶ 11-12; 99 ¶ 13).[1]

Essentially, Plaintiffs assert that the street light poles in the area where accident occurred were not energized. (Docket No. 99 ¶ 26). Plaintiffs further allege that those street light poles were under the jurisdiction, ownership, care, custody and control of PREPA, the PRHTA, and the Municipality. Id. Accordingly, they maintain that said co-defendants negligently failed to maintain the street light poles functional and are thereby liable. Id. ¶¶ 29-30.

On January 28, 2019, PREPA filed a *Motion for Summary Judgment*. (Docket No. 252). PREPA avers that the highway where the accident occurred corresponded to a construction project titled

---

[1] Accordingly, Plaintiffs' *Third Amended Complaint* at Docket No. 99 is the operative complaint.

Project AC-200213 ("Project AC-200213" or "Project"). Id. at 3. PREPA maintains it was neither the owner nor the contractor of the Project, and its only duties regarding the same consisted of approving the design of the lighting system and certifying that it was built accordingly. Id. However, PREPA avers Project AC-200213 was never finished nor delivered to PREPA for energization, therefore barring it from liability. Id.

Plaintiffs filed an *Opposition to PREPA's Motion for Summary Judgment*. (Docket No. 265). Their main argument is that on June 6, 2006, pursuant to a document titled *Notification of the Constitution of Access Easement and Cession of Transfer and Warranty* ("*Notification of Cession and Transfer*"), the PRHTA ceded and transferred the distribution or transmission of Project AC-200213 to PREPA for the conservation and installation of all the posts, structures, and necessary equipment that make up the electrical system of the project. Id. at 5. Therefore, Plaintiff alleges PREPA can be held liable in the case at bar. Id. Furthermore, Plaintiffs take issue with PREPA's claim that the Project was never energized because the area where the accident occurred had been temporarily illuminated by the PRHTA for the Central American and Caribbean Games of 2010. Id. at 8-9.

Lastly, PREPA replied to Plaintiffs' opposition. (Docket No. 276). Therein, PREPA highlights that the June 6, 2006 *Notification*

*of Cession and Transfer* provides that it will become effective on the date that PREPA "incorporates and connects the project's distribution and transmission system" to PREPA's electrical grid. Id. at 2. PREPA maintains that the Project was not completed and thus, it was never energized and the cession and transfer from the PRHTA to PREPA never occurred.  Id. at 2-3. PREPA re-asserts it is not liable because it neither designed the lighting system nor did it energize it. Id. at 4-5.

## II.  LEGAL STANDARD

A motion for summary judgment is governed by Fed. R. Civ. P. 56(a). Summary judgment is proper if the movant shows that (1) there is no genuine dispute as to any material fact and (2) they are entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." Thompson v. Coca-Cola Co., 522 F.3d 168, 175 (1st Cir. 2008). A fact is considered material if it "may potentially 'affect the outcome of the suit under governing law.'" Albite v. Polytechnic Univ. of Puerto Rico, Inc., 5 F. Supp. 3d 191, 195 (D.P.R. 2014) (quoting Sands v. Ridefilm Corp., 212 F.3d 657, 660-661 (1st Cir. 2000)).

The moving party has "the initial burden of demonstrat[ing] the absence of a genuine issue of material fact with definite and

competent evidence." Mercado-Reyes v. City of Angels, Inc., 320 F.
Supp. 344, at 347 (D.P.R. 2018) (quotation omitted). The burden
then shifts to the nonmovant, to present "competent evidence to
rebut the motion." Bautista Cayman Asset Co. v. Terra II MC & P,
Inc., 2020 WL 118592, at 6* (quoting Méndez-Laboy v. Abbott Lab.,
424 F.3d 35, 37 (1st Cir. 2005)). A nonmoving party must show "that
a trialworthy issue persists." Paul v. Murphy, 2020 WL 401129, at
*3 (1st Cir. 2020) (quotation omitted).

While a court will draw all reasonable inferences in favor of
the non-movant, it will disregard conclusory allegations,
unsupported speculation and improbable inferences. *See* Johnson v.
Duxbury, Massachusetts, 931 F.3d 102, 105 (1st Cir. 2019).
Moreover, the existence of "some alleged factual dispute between
the parties will not affect an otherwise properly supported motion
for summary judgment." Scott v. Harris, 550 U.S. 372, 379 (2007)
(quotation omitted). Hence, a court should review the record in
its entirety and **refrain from making credibility determinations or
weighing the evidence**. *See* Reeves v. Sanderson Plumbing Products,
Inc., 530 U.S. 133, 135 (2000).

In this District, summary judgment is also governed by Local
Rule 56. *See* L. CV. R. 56(c). Per this Rule, an opposing party
must "admit, deny or qualify the facts supporting the motion for
summary judgment by reference to each numbered paragraph of the

moving party's statement of material facts." Id. Furthermore, unless the fact is admitted, the opposing party must support each denial or qualification with a record citation. Id.

Additionally, Local Rule 56(c) allows an opposing party to submit additional facts "in a separate section." L. CV. R. 56(c). Given that the plain language of Local Rule 56(c) specifically requires that any additional facts be stated in a separate section, parties are prohibited from incorporating numerous additional facts within their opposition. *See* Natal Pérez v. Oriental Bank & Trust, 291 F. Supp. 3d 215, 218-219 (D.P.R. 2018) (quoting Carreras v. Sajo, Garcia & Partners, 596 F.3d 25, 32 (1st Cir. 2010) and Malave-Torres v. Cusido, 919 F.Supp. 2d 198, 207 (D.P.R. 2013)).

If a party opposing summary judgment fails to comply with the rigors that Local Rule 56(c) imposes, "a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated." Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007). Thus, litigants ignore this rule at their peril. *See* Natal Pérez, 291 F. Supp. 3d at 219 (citations omitted).

### III. FINDINGS OF FACT

To make findings of fact, the Court analyzed PREPA's *Statement of Uncontested Material Facts in Support of Motion for Summary Judgment* (Docket No. 259-1) and Plaintiffs' *Opposing Statement of*

*Material Facts* (Docket No. 264). After only crediting material facts that are properly supported by a record citation[2] and uncontroverted, the Court makes the following findings of fact:[3]

## A. Project AC-20013

1. Project AC-200213 (also referred to as the "Project") began in 2003 and entailed the construction of an interchange at the intersection of Highways PR-2 and PR-309 and of an overpass at the intersection of Highway PR-2 and PR-319. (Docket No. 259-1 ¶¶ 12, 18).

2. The proposed works for the Project included constructing two prestressed concrete bridges over highways PR-2 and PR-319 as well as drainage, pavement markings, lighting, traffic signs, relocation of PREPA and Puerto Rico Aqueducts and Sewer Authority ("PRASA") utilities, among other miscellaneous works. Id.

3. The improvements to the existing lighting system consisted of the installation of: (a) forty 40-foot aluminum light poles with double luminary through the central aisle of Highway PR-2; and (b) 104 single-arm posts on the marginal streets and intersections leading into the Municipality of Hormigueros

---

[2] Any supporting documents not in the English language and lacking a certified English translation were not considered. *See* L. CV. R. 5(c).
[3] References to a specific Finding of Fact shall be cited in the following manner: (Fact ¶ _).

(the "Municipality" or "Hormigueros"). (Docket Nos. 259-1 ¶¶ 13-14; 281-1).

4. Project AC-200213 was owned by the PRHTA. (Docket Nos. 281-3 at 1; 184-2 at 2).

5. The Project, which totaled $18,949,884.00, was financed with funds apportioned by the PRHTA. (Docket No. 259-1 ¶¶ 12, 19).

6. The general contractor for the Project was Construcciones José Carro. Id. ¶ 16.

7. The Project's designer was CMA Architects & Engineers LLC. Id. ¶ 17.

8. The electrical sub-contractor for Project AC-200213 was Mega Power. Id. ¶ 20.

9. Project AC-200213 includes the area of the accident, which occurred in the vicinity of road PR-309. (Docket Nos. 256-5 at 76; 259-1 ¶ 62).

**B. PREPA's relationship to Project AC-20013**

10. The stages of PREPA's participation in a project such as Project AC-200213 are the following:

   a. A draft or pre-project application is submitted

   b. PREPA performs a study on the proposed facilities

   c. PREPA sends an evaluation letter with comments and/or recommendations

d. The designer submits the project's design plans following PREPA's guidelines

e. After evaluation, either PREPA endorsees the project's design plans or returns it with comments and/or recommendations

f. The designer makes any needed corrections to the project design plan and re-submits it

g. PREPA endorses the project design plans

h. The owner, or its representative, submits the application for starting the project to the Office of Inspections

i. PREPA then assigns an inspector for the project,

j. PREPA schedules a meeting at the beginning of the project's construction phase

k. The owner pays the corresponding fees

l. The construction phase of the project begins

m. The owner's private inspector, by way of a certification, submits the periodic reports and the final report, together with the Inspection Certification

n. The contractor submits the project certification signed by a licensed engineer or electrician

o. PREPA reviews the certification and payment of fees made in the project

     p. After PREPA receives and accepts the certification, the owner goes to the corresponding municipality and requests to pay via Form 18 of public lighting

     q. After the Form 18 is received by PREPA, PREPA conducts the final inspection and then energizes the project

(Docket No. 259-1 ¶ 76).

11. On June 5, 2006, the PRHTA issued a "*Notification of the Constitution of Access Easement and Cession of Transfer and Warranty*" with regards to the Project. With this document, the PRHTA:

> CEDES AND TRANSFERS the system of distribution or transmission built within the property, as described in the first paragraph of this document, its equipment, materials, and accessories to the Electric Power Authority of Puerto Rico. Said cession and transfer will be effective **on the date that the Electric Power Authority incorporates and connects the project's distribution and transmission system to the Electric Power Authority's electrical grid.**

(Docket No. 184-2 ¶ 3) (emphasis added).

## C. Setbacks for the energization of Project AC-20013

12. On January 9, 2009, Principal Supervising Engineer Edgardo Arocho-Piris informed Yaritza Cordero-Bonilla, the administrator of Project AC-200213, that the PRTHA must inform PREPA in writing whether the works will be completed. (Docket Nos. 259-1 ¶ 36; 281-4).

13. On March 9, 2009, the Municipality notified the PRHTA that the lights for Project AC-2000213 remained deactivated and that it needed to know if they could assist with any issue in order to light the area. (Docket Nos. 259-1 ¶ 37; 281-5).

14. On March 30, 2009, the Mayor of Hormigueros, Hon. Pedro J. García ("Mayor García"), and personnel from the PRHTA had a meeting to discuss why Project AC-200213 was not energized. (Docket Nos. 259-1 ¶¶ 38-39; 281-6 at 1).

15. At the meeting, the PRHTA informed that the electrical subcontractor completed the work but the cables from the lights were stolen and a subsequent quote to replace the stolen lights was very costly. Furthermore, pathway clearance needed to be performed before the Project could be energized. (Docket Nos. 259-1 ¶¶ 40-42; 281-6 ¶ 3).

16. When vandalism such as this occurs, the contractor is responsible for filing an insurance claim to cover the theft. (Docket No. 259-1 ¶ 30).

17. Mayor García pledged to speak with PREPA's district manager to identify how the work can be expedited and mentioned that the Municipality had retained the services of a former PREPA engineer and two electricians who could perform the work. (Docket Nos. 259-1 ¶ 43; 281-6 ¶ 5).

18. The PRHTA mentioned that the work that remained to be performed was complex and included installing some substations. (Docket No. 259-1 ¶ 44).

19. Lastly, the PRHTA recommended that a report be prepared identifying all pending electrical work, to then assess the Municipality's ability to perform it.  Id. ¶ 45.

20. On May 4, 2009, Mayor García requested to meet with Mr. Raúl Ruiz ("Mr. Ruiz"), PREPA's Regional Administrator for the region of Mayagüez, to discuss the Project. (Docket Nos. 259-1 ¶ 46; 281-7).

21. On May 12, 2009, Mayor García met with Mr. Ruiz and with Luis Hernández ("Mr. Hernández"), Director for the District of San Germán. At this meeting, Mayor García was informed that PREPA would authorize, by way of exception, the work pertaining to the electrical lines going through the central barrier of Highway PR-2, so that the luminaries could be energized when the remaining work for the Project was complete. (Docket Nos. 259-1 ¶¶ 47-48; 281-8).

22. On May 13, 2009, PREPA formally informed the PRHTA via letter that, although Project AC-2000213 did not comply with PREPA's rules and standards, given the economic crisis and that the Project was already built, PREPA would grant PRHTA's request to embed wire tubing for the public lighting system in the

central concrete barrier of Highway PR-2. (Docket Nos. 259-1
¶ 49; 281-9).

23. However, PREPA noted that this approval did not establish
    precedent, and that for PREPA to accept the total project,
    the PRHTA must comply with all aspects of PREPA's inspection.
    (Docket Nos. 259-1 ¶ 50; 281-9).

24. On June 8, 2009, a special meeting was held between the PRHTA,
    the Municipality and PREPA regarding Project AC-200213.
    (Docket No. 259-1 ¶ 51).

25. At the meeting, PREPA was informed that the Project's lighting
    system had not been completed because the installed cables
    were stolen in October, the contractor demanded a change in
    price for the reinstallation of the stolen cables, and the
    PRHTA rejected the contractor's demand after evaluating the
    same. Id. ¶ 52.

26. However, a new quote was requested from the contractor and
    would be sent to the PRHTA's Central Office for approval. The
    Municipality also requested that any future quote be
    forwarded to the Municipality so that they could collaborate
    in the approval process. Id. ¶¶ 53, 56.

27. On their part, at the same meeting, PREPA informed that: (a)
    its inspection office approved the construction of electrical
    lines through the central barrier of PR-2; and (b) if the

contractor and the PRHTA reached an agreement for the
reinstallation of the stolen cables, PREPA would be willing
to expedite its inspections and connect the system to the
power supply. Id. ¶¶ 54-55.

28. On June 30, 2009, the contractor submitted a quotation
totaling $255,000.00 for the reinstallation of the cables at
Project AC-200213 (the "Quotation"). Id. ¶ 57.

29. The Quotation was submitted to the PRHTA for evaluation on
July 6, 2009. Id. ¶ 58.

**D. Subsequent communications from 2010 through 2014 regarding the status of Project AC-20013**

30. On May 13, 2010, Mayor García, on behalf of the Municipality,
wrote to the PRHTA to inquire regarding the status of the
still-unlit streetlamps and work pending for Project AC-
200213. Id. ¶ 59.

31. For the 2010 Central American Games, the PRHTA ran cables
from pole to pole to provide lighting on a temporary basis in
the area of the Project. (Docket No. 256-5 at 16, 54-58).

32. On September 1, 2011, PREPA instructed the Municipality, via
letter addressed to Mayor Garcia, that (1) the Municipality
had to obtain authorization from the PRHTA to complete the
work to the lighting system; (2) the PRHTA had to assign and
transfer the lighting system to PREPA in order to have it
energized; and (3) once the authorization was received, the

Municipality had to pay for PREPA to repair and equip the lighting system. (Docket Nos. 259-1 ¶ 63; 281-15).

33. In a letter dated April 22, 2014, Eng. Pedro Janer from CMA Architects & Engineers, the designers of the Project's lighting system, notified Alberto Lastra Power, executive director of the Permit Management Office ("OGPE" by its Spanish acronym) that:

> The Puerto Rico Highway and Transportation Authority (PRHTA) proposes the refurbishment of the existing lighting system along Highway PR-2 in the section spanning from kilometer 161.8 to kilometer 163.5, located in the municipality of Hormigueros (project ACT-200213 [sic]). **The lighting in this area was not fully constructed, the substations were not installed, and the system was not connected to the power supply, which causes this section of the highway to be left without proper lighting. Throughout this project, the PRHTA proposes completing the construction of the lighting and the required substations and connecting the system to the power supply.**
>
> The project will be carried out on a public roadway and **belongs to the PRHTA.**

(Docket Nos. 259-1 ¶¶ 25, 64-67 and 281-3) (emphasis added).

34. CMA Architects & Engineers submitted a request for recommendation from PREPA, asking that PREPA "indicate the connection point and the voltage to be utilized" for the Project. (Docket Nos. 259-1 ¶ 68; 281-16).

35. On May 13, 2014, PREPA provided the Infrastructure Manager of OGPE with a project assessment (the "Assessment"). Therein, PREPA identified the corresponding points of connection and voltage for the Project. (Docket Nos. 259-1 ¶ 69; 281-17).

36. The Assessment specified that it did not constitute a review of the design plan, and that the designer maintained the responsibility to submit the plans for approval in compliance with applicable regulations. Furthermore, "[f]inal plans of the unit and/or letter form the project owner, charge calculations and Lambert coordinates corresponding to the location of the project will be required prior to the filling of the plans." (Docket Nos. 259-1 ¶¶ 71-72; 281-17 ¶¶ 11-12).

37. Moreover, per the Assessment, "[t]o know the cost of the work to be performed by PREPA … the customer must request the corresponding estimate from the Studies and Estimates Section, Mayagüez Region." (Docket Nos. 259-1 ¶ 70; 281-17 ¶ 8).

38. On May 21, 2014, Mayor García wrote PREPA a letter stating the following:

> On November 28, 2011, the Municipality of Hormigueros, by way of WR-3420998, entered into an agreement with the Electric Power Authority for secondary wiring for 12 floodlights for the amount of $6,701.00 as part of a project that was originally developed by the Highway Authority, AC-200213.

> At present, six of these 12 floodlights have been unlit for over five months. On February 13, 2014, the engineer Luis Valentín notified this situation on behalf of the municipality in item two of said letter. In a meeting held on March 13, 2014 in the mayor's office in Hormigueros, we were informed that said line, identified as sulfated, would be replaced in order to correct the problem. As of yet, said work has not been performed. We refer to the lights located between the marginal road in front of the car dealership and the intersection of PR-319 and PR-2.
>
> I would appreciate your collaboration to solve this safety issue.

(Docket No. 281-14).

39. These light poles were located at the intersection between PR-319 and PR-2. (Docket No. 259-1 ¶ 61).

40. After the May 13, 2014 Assessment letter from PREPA was received by the PRHTA, the Project was halted. Id. ¶ 75.

**E. Project AC-20013 was not energized**

41. PREPA did not approve the lighting phase of Project AC-200213 because said phase was never completed by the PRHTA or its contractor. Id. ¶ 77.

42. As of April 16, 2018, i.e. the date of Ms. Ivelisse Pérez-Márquez's (the PRHTA'S project supervisor) deposition, Project AC-200213 had not been wired and the relevant substations had not been installed. Id. ¶¶ 78-79).

43. PREPA could not energize the Project if there were still substations to be installed. Id. ¶ 80.

## IV.  ANALYSIS

The substantive law of Puerto Rico controls in this diversity case. *See* Rivera-Marrero v. Presbyterian Cmty. Hosp., Inc., 2016 WL 7670044, at *1 (D.P.R. 2016) (quoting Summers v. Fin. Freedom Acquisition LLC, 807 F.3d 351, 354 (1st Cir. 2015)) ("Since this is a diversity case, we look to federal law for guidance on procedural matters (such as the summary judgment framework) and to state law (here, [Puerto Rico] law) for the substantive rules of decision.").

Plaintiffs are seeking emotional damages as well as compensation for medical and funeral expenses following the death of their son, allegedly caused in part by co-defendants' negligence. (Docket No. 99 ¶¶ 41, 43). Article 1802 of the Civil Code is Puerto Rico's general tort statute. It states that a person who "causes damages to another through fault or negligence" shall be liable in damages. P.R. Laws Ann. tit. 31, § 5141. "The three essential elements for general tort claims are: (1) evidence of physical or emotional **injury**, (2) a negligent or intentional act or **omission (the breach of duty element)**, and (3) a sufficient **causal nexus** between the injury and defendant's act or omission (in other words, proximate cause)." Vazquez-Filippetti v. Banco Popular de Puerto Rico, 504 F.3d 43, 49 (1st Cir. 2007) (emphasis

added) (citing Torres v. KMart Corp., 233 F.Supp.2d 273, 277-78 (D.P.R. 2002)).

The first element is met, as it is uncontested that Plaintiffs have suffered emotional injury following the death of their son. As to the second element, given that Plaintiffs allege PREPA failed to install, maintain, and energize the light poles related to Project AC-200213, the question is whether an omission or breach of duty occurred. Omissions generate liability under Article 1802 **"when the law imposes a duty of care requiring the defendant to conform to a certain standard of conduct for the protection of others against unreasonable risk**." Zabala-Calderon v. United States, 616 F. Supp. 2d 195, 199 (D.P.R. 2008) (quotation omitted). This duty of care "may arise in one of three ways: '(1) by a statute, regulation, ordinance, bylaw, or contract; (2) as the result of a special relationship between the parties that has arisen through custom; or (3) as the result of a traditionally recognized duty of care particular to the situation.'" Carr v. Puerto Rico Ports Auth., 2011 WL 1484158, at *3 (D.P.R. 2011) (citing De-Jesus-Adorno v. Browning Ferris Industries of Puerto Rico, Inc., 160 F.3d 839, 842 (1st Cir. 1998)). *See also* Vazquez-Quintana v. Falk, 2018 WL 8838860, at *4 (D.P.R. 2018).

Foreseeability is a central "component of the 'breach' sub-element because a defendant *only* breaches his duty if he acted (or

failed to act) in a way that a reasonably prudent person would foresee as creating undue risk." <u>Vazquez-Filippetti</u>, 504 F.3d at 49 (citing <u>Pacheco Pietri v. ELA</u>, 1993 P.R.-Eng. 839, 817 (1993)) (emphasis added). "However, the foreseeability required under art. 1802 does not extend to all imaginable effects resulting from defendant's conduct. This would be tantamount to turning the defendant into an absolute insurer of its acts and omissions." <u>Wojciechowicz v. United States</u>, 576 F. Supp. 2d 241, 272 (D.P.R. 2008), aff'd, 582 F.3d 57 (1st Cir. 2009) (citations omitted).

It is uncontested **PREPA was neither the owner, designer, nor electrical contractor of Project AC-200213.** (Facts ¶¶ 4, 6, 7, 8). Nevertheless, Plaintiffs assert that PREPA had a duty to maintain and energize the Project's lighting pursuant to the June 5, 2006 "Notification of the Constitution of Access Easement and Cession of Transfer and Warranty" issued by the PRHTA. (Fact ¶ 11). Therein, the PRHTA ceded and transferred the Project's "system of distribution or transmission built within the property, as described in the first paragraph of this document, its equipment, materials, and accessories to [PREPA]."[4] However, this cession to PREPA **was not instantaneous**. The plain text of the document

---

[4] In their *Opposition* to PREPA's *Motion for Summary Judgment*, Plaintiffs argue that this constitutes a unilateral declaration of intention by PREPA. This argument fails on its face given that the "Notification of Constitution of Access Easement and Cession of Transfer and Warranty" was issued by the *PRHTA*, and not by PREPA. (Fact ¶ 11).

provides, "[s]aid cession and transfer will be effective **on the date that [PREPA] incorporates and connects the project's distribution and transmission system to [PREPA]'s electrical grid**." Id. (emphasis added). Therefore, PREPA's duty as to the Project was contingent on its incorporation and connection to the electrical grid.

Although Plaintiffs point to the *temporary* lighting for the Central American Games in 2010 and an agreement in 2014 for PREPA to assist with the secondary wiring of 12 floodlights, **the record reflects that the Project was not energized or connected to the electrical grid**. (Facts ¶¶ 31, 38). Importantly, Project AC-200213 was not energized, and its wiring system was not completed, due to events outside of PREPA's control, namely the theft of electrical cables after work had been completed by the subcontractor. (Fact ¶ 15). In fact, PREPA made exceptions to facilitate the PRHTA's completion of the Project and expedite its subsequent energization. (Facts ¶¶ 21-23; 27).

Given that energization of the Project by connecting to PREPA's grid **did not** occur, neither did the cession and transfer. Consequently, PREPA did not have a duty of care with regards to the unfinished Project. In the operative *Complaint*, Plaintiffs mention that various co-defendants failed to comply with the "Illumination Handbook of the Puerto Rico Electric Power

Authority, the Federal Highway Administration Rules, the National Highway System Designation Act of 1995, the AASHTO Highway Subcommittee on Design, Federal Highway Act of 1956 and the Federal Highway Administration Lighting Handbook, among others." (Docket No. 99 ¶ 30). However, they fail to identify any specific statute or regulation that imposes upon PREPA the duty to energize an uncompleted highway project of which it is not the owner, designer, or electrical subcontractor.

The Court notes that PREPA "has the duty to exercise the highest degree of care, due to the inherently dangerous nature of the product that it markets" and that this "elevated duty of care covers the installation, maintenance and operation of its power generating plants." Martinez De Jesus v. Puerto Rico Elec. Power Auth., 256 F. Supp. 2d 122, 125 (D.P.R. 2003) But "**PREPA is not an absolute insurer of every accident or imaginable risk**." Torres Solis et al. v. A.E.E. et als., 136 P.R. Dec. 302 (1994) (emphasis added). Moreover, its elevated duty is related to inspecting and maintaining electrical distribution and/or generation systems under its control, not those which have yet to be built or properly ceded to it. *See* Torres Solís, 136 P.R. Dec. 302; Méndez Purcell v. A.F.F., 110 D.P.R. 130, 134 (1980); Burgos Quiñones v. A.F.F., 90 D.P.R. 613, 619 (1964); Ramos v. A.F.F., 86 D.P.R. 603, 609 (1962)).

## V.   CONCLUSION

PREPA was not the owner, designer or electrical subcontractor of the Project. Further, at least as of April 2018, Project AC-200213's owner, PRHTA, had not completed the necessary construction of the Project, which resulted in PREPA not being able to energize it. Therefore, the June 5, 2006 "Notification of the Constitution of Access Easement and Cession of Transfer and Warranty" **never entered into effect** and the cession and transfer of the Project from the PRHTA to PREPA never occurred.

In light of the above, the Court must conclude that PREPA did not have a legally recognized duty to install, energize, or otherwise maintain light poles for Project AC-200213. Therefore, PREPA's *Motion for Summary Judgment* at Docket No. 252 is **GRANTED.** Plaintiffs' claims against PREPA are **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED.**

In San Juan Puerto Rico, this 18th day of January 2023.

S/ RAÚL M. ARIAS-MARXUACH
United States District Judge