**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

DINO DEMARIO, *et al.*

**Plaintiffs**

**v.**                                                    **CIVIL NO.** 16-2897(RAM)

ANTHONY LAMADRID-MALDONADO, *et al.*

**Defendants**

<u>**OPINION AND ORDER**</u>

RAÚL M. ARIAS-MARXUACH, District Judge

This matter comes before the Court on Dino DeMario and Cheryl Steele (collectively "Plaintiffs") and co-defendant ACE Insurance Company's ("ACE") cross-motions for summary judgment (Docket Nos. 163 and 249, respectively). Having reviewed the parties' submissions (Docket Nos. 163, 164, 208, 215, 240, 243, 249, 262, 270) and the record as a whole, the Court **DENIES IN PART** and **GRANTS IN PART** Plaintiffs' *Motion for Summary Judgment* requesting declaratory judgment at Docket No. 163, as well as **GRANTS IN PART** and **DENIES IN PART** ACE's *Motion for Summary Judgment* at Docket No. 249.

**I. BACKGROUND**

Dino DeMario and Cheryl Steele (collectively "Plaintiffs") are the parents of the late Nicholas DeMario. (Docket No. 99 ¶¶ 3-4). On November 1, 2015, Nicholas DeMario was assisting his friends

with pushing their vehicle, a Mazda Protege with license plate number 1KG-492, which had suffered a mechanical breakdown on a road in the Municipality. Id. ¶ 16. Anthony Lamadrid-Maldonado ("Lamadrid") was driving a Mitsubishi Eclipse with license plate number GLG-871 in the same direction. Id. ¶ 17. Lamadrid's Mitsubishi hit the rear end of the Mazda and Nicholas DeMario was pronounced dead at the scene. Id.

On October 31, 2016, Plaintiffs filed a lawsuit against Lamadrid, the Municipality, the Puerto Rico Electric Power Authority ("PREPA"), the Puerto Rico Highway and Transportation Authority ("PRHTA"), and unnamed insurance companies, seeking emotional damages as well as medical and funeral expenses caused by the loss of their son. (Docket No. 1). Plaintiffs subsequently filed three (3) amended complaints incorporating as co-defendants various insurance companies, including Triple-S. (Docket Nos. 2 ¶ 10; 61 ¶¶ 11-12; 99 ¶ 13). Specifically, in the operative complaint, i.e., Plaintiffs' *Third Amended Complaint*, they allege that ACE was the liability insurer of co-defendants PREPA and the Commonwealth of Puerto Rico, and as such is "jointly and severally liable for the damages caused to the plaintiffs" by its insured. (Docket No. 99 ¶¶ 12, 36). Plaintiffs assert their emotional damages exceed ten million dollars ($10,000,000.00), whereas the medical and funeral expenses incurred amount to more than fifteen thousand dollars ($15,000.00). Id. ¶¶ 41, 43.

Plaintiffs subsequently filed a *Motion for Summary Judgment* seeking declaratory relief. (Docket No. 163). Namely, Plaintiffs request that the Court declare that: (a) both PREPA and the Commonwealth of Puerto Rico are named insureds under the insurance policy issued by ACE (the "Policy"); (b) the Policy provides coverages for direct actions; (c) the Policy will drop down in the event of the reduction or exhaustion of the underlying limit, such as aggregate limit of the underlying insurance provided by MAPFRE to the Commonwealth of Puerto Rico; and (d) that in the event of such a drop down, the amount of damages need not exceed $1,000,000. Id. at 20-21. ACE filed an opposition, to which Plaintiffs replied, ACE sur-replied, and Plaintiffs replied again. (Docket Nos. 208, 215, 240, and 243).

On its part, ACE filed a separate *Motion for Summary Judgment*. (Docket No. 249). ACE seeks declaratory judgment holding that its obligation to pay, if any, is contingent on the insured paying an out of pocket $1,000,000 self-insured retention as well as a $1,000,000 deductible, and that the Policy does not drop down due to the insured's inability to pay. Id. at 10-13. ACE also requests dismissal of Plaintiffs' claims against it as the insurer of the Commonwealth of Puerto Rico and of Plaintiffs' claims for emotional trauma and mental anguish. Id. at 16. In particular, it avers dismissal as to the latter claims is proper because they are not

covered by the Policy. Id. Plaintiffs filed a response in opposition and ACE filed a reply. (Docket Nos. 270).

Lastly, on January 18, 2023, the Court issued an Opinion and Order dismissing Plaintiffs' claims against PREPA, ACE's insured. (Docket No. 311).

## II. LEGAL STANDARD

Summary judgment is proper under Fed. R. Civ. P. 56(a) if a movant shows "no genuine dispute as to any material fact" and that they are "entitled to judgment as a matter of law." A genuine dispute exists "if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." Alicea v. Wilkie, 2020 WL 1547064, at *2 (D.P.R. 2020) (quotation omitted). A fact is material if "it is relevant to the resolution of a controlling legal issue raised by the motion for summary judgment." Bautista Cayman Asset Co. v. Terra II MC & P, Inc., 2020 WL 118592, at *6 (D.P.R. 2020) (quotation omitted).

The party moving for summary judgment "bears the initial burden of showing that no genuine issue of material fact exists." Feliciano-Munoz v. Rebarber-Ocasio, 2020 WL 4592144, at *6 (1st Cir. 2020) (citation omitted). Whereas the non-movant may "defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." Robinson v. Town of Marshfield, 950 F.3d 21, 24 (1st Cir. 2020) (quotation omitted). However, it "cannot merely 'rely on an absence of

competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute.'" Feliciano-Munoz, 2020 WL 4592144, at *6 (quoting McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)). Solely relying on "conclusory allegations, improbable inferences, and unsupported speculation" is insufficient to defeat summary judgment. River Farm Realty Tr. v. Farm Family Cas. Ins. Co., 943 F.3d 27, 41 (1st Cir. 2019) (quotation omitted).

Local Rule 56 also governs summary judgment. *See* L. CV. R. 56. Per this Rule, a nonmoving party must "admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts." Id. The First Circuit has stated that adequately supported facts "shall be deemed admitted unless controverted in the manner prescribed by the local rule." Advanced Flexible Circuits, Inc. v. GE Sensing & Inspection Techs. GmbH, 781 F.3d 510, 520 (1st Cir. 2015) (quotation omitted). Hence, "litigants ignore Local Rule 56 at their peril." Calderón Amézquita v. Vices, 2019 WL 3928703, at *1 (D.P.R. 2019) (citation omitted).

### III. FINDINGS OF FACT

After analyzing Plaintiffs' *Statement of Material Facts* (Docket No. 164), ACE's *Reply Statement of Material Facts* (Docket No. 208-1), ACE's *Statement of Material Facts* (Docket No. 249-1), and Plaintiffs' *Opposing Statement of Material Facts* (Docket No.

262-1), and **only crediting material facts** that are **properly supported by a record citation and uncontroverted,** the Court makes the following findings of facts:[1]

1.  ACE Insurance Company ("ACE") issued a Commercial Umbrella Liability, Policy Number 47PR701540, to the Puerto Rico Electric Power Authority ("PREPA") (subsequently, the "Policy"). In consideration of PREPA paying a renewal premium totaling $1,624,014.00, ACE renewed the Policy for the period from July 30, 2015 through July 30, 2016. (Docket Nos. 164 ¶ 2; 249-1 ¶ 1; 87-1 at 1-4).

2.  Pursuant to its Endorsement R, the "extended named insured" under the Policy is:

    > **PUERTO RICO ELECTRICAL POWER AUTHORITY** AND/OR PREPA NETWORKS LLC, AND/OR PREPA HOLDINGS, LLC &/OR CONSOLIDATED TELECOMMUNICATIONS OF PR LLC &/OR INTERAMERICAN ENERGY SERVICES, LLC AND/OR **COMMONWEALTH OF PUERTO RICO,** SECRETARY OF THE TREASURY, C/O PUBLIC INSURANCE BUREAU ANY SUBSIDIARY, NEWLY ACQUIRED OR CONTROLLED CORPORATION AND/OR COMPANY AS MAY NOW BE CONSTITUTED OR HEREAFTER FORMED, AND OVER WHICH THE NAMED INSURED MAINTAINS OWNERSHIP OR MAJORITY INTEREST.

    (Docket No. 164 ¶ 7) (emphasis added).

3.  On its part, the Special Conditions Endorsement specifies that ACE's wording of "broad form named insured" under the Policy is "PR Electric Power Authority and/or PREPA Networks

---

[1] References to a Finding of Fact shall be cited as follows: (Fact ¶ _).

LLC, and/or PREPA Holdings, LLC, &/or Consolidated Telecommunication of PR LLC &/or Interamerican Energy Service, LLC and/or Commonwealth of Puerto Rico, Secretary of the Treasury, c/o Public Insurance Bureau." Id. ¶ 8.

4.  This endorsement clarifies that the inclusion of more than one entity as a named insured does not affect their right with respect to any claim against them, and that:

> **This policy shall insure each corporation, person or organization, firm or entity in the same manner as though a separate policy had been issued to each;** but nothing herein contained shall operate to increase the company's liability as set forth elsewhere in this policy beyond the amount or amounts for which the company would have been liable if any one person or interest had been named as insured, unless such named insured acquired separate primary limits under another policy when limits will be applied separately and not jointly for each insured.

Id. ¶ 9 (emphasis added).

5.  Throughout the policy, the words "you" and "your" refer to the named insured. (Docket No. 249-1 ¶ 11).

6.  The Policy issued by ACE to PREPA is subject to limits of up to $10,000,000 for each "incident;" a $10,000,000 policy aggregate; and a "retained limit" or "underlying insurance" of $1,000,000 for each incident. Furthermore, the Policy has a $1,000,000 deductible per occurrence with an annual aggregate of $2,000,000.00. (Docket Nos. 164 ¶ 3; 249-1 ¶ 2; 87-1 at 1-4, 63-64).

7. The Policy defines "incident" as "[a]n occurrence or accident, including the continuous or repeated exposure to substantially the same general harmful conditions when the term is used in reference to 'bodily injury': [sic] and/or 'property damage.'" (Docket No. 249-1 ¶ 12).

8. "Retained Limits" are defined thereunder as meaning either:

> a.   The total limits of insurance available for injury or damage arising out of an "incident" covered by the "underlying insurance"; or
>
> b.   The limit shown as the "Retained Limit" on the Declarations for injury or damage arising out of and (sic) "incident" not covered, except for the exhaustion of underlying aggregate limits of insurance, by the "underlying insurance," but covered in this policy.

(Docket Nos. 164 ¶ 13; 87-1 at 30).

9. The Policy defines "underlying insurance" as "any insurance policies available to any insured (whether primary, excess, excess contingent, or otherwise) including but not limited to, the policies listed and described in the Schedule of Underlying Insurance and any renewal, replacement and any Extended Reporting Period(s) of those policies." (Docket Nos. 164 ¶ 10; 87-1 at 31-32).

10. The Renewal Certificate contains a Schedule of Underlying Insurance that notes a Self Insured Retention ("SIR") of

$1,000,000 for the General Aggregate and Each occurrence. (Docket No. 164 ¶ 4).

11. As per Endorsement E of the Policy, titled "Deductible Liability Insurance," coverage for Bodily Injury Liability and Property Damage Liability under the Policy is subject to a $1,000,000 deductible per occurrence with an annual aggregate of $2,000,000.00. Furthermore, the following limitation applies to this coverage:

> [Ace's] obligation under the Bodily Injury Liability and Property Damage Liability Coverages to pay damages on your behalf applies only to the amount of damages in excess to any deductible amounts stated in the Schedule above as applicable to such coverages and **which are in excess of the "Self Insurance Retention" stated in the declarations.**

(Docket Nos. 249-1 ¶ 3; 87-1 at 63-64) (emphasis in original).

12. Per "SECTION VI – DEFINITIONS" of the Policy:

> 4. "Bodily injury" means:
>
>> a. Bodily injury sickness or disease sustained by a person, including death resulting from any form of these at any time
>>
>> b. **Mental anguish sustained by someone who has suffered a covered "bodily injury"** defined in paragraph 4.a. of this section.

(Docket Nos. 164 ¶ 10; 249-1 ¶ 13; 87-1 at 28) (emphasis added).

13. On the other hand, the Policy distinguishes "personal injury" as an injury *not* including bodily injury arising out of one or more of the following offenses: false arrest, detention or imprisonment, malicious prosecution, wrongful eviction from, wrongful entry into or invasion of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor; oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or oral or written publication of material that violates a person's right of privacy. (Docket No. 249 ¶ 14).

14. In its relevant part, the Insuring Agreement in Endorsement X, titled "SIR Endorsement", provides states that

> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" (other than "bodily injury" arising out of "personal and advertising injury") or "property damage" to which this insurance applies, and which are in excess of the "Self Insured Retention" stated in the Declarations.
>
> b. This insurance applies to "bodily injury" and "property damage" only if: (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; (2)   The "bodily injury" or "property damage" occurs during the policy period; [...]
>
> [...]

> e. **Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".**
>
> No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under ALLOCATED LOSS ADJUSTMENT EXPENSES - COVERAGES A AND B below, but we shall have the right and opportunity to assume from the insured the defense and control of any claim or "suit", including any appeal from a judgment, seeking payment of damages covered under this policy that we believe to exceed the "Self Insured Retention". In such case, the insured shall cooperate fully. The amount we will pay for damages are in excess of the "Self Insured Retention" is limited as described in Section III - Limits of Insurance.

(Docket Nos. 164 ¶ 5; 249-1, ¶ 4) (emphasis added).

15. SECTION III – LIMITS OF INSURANCE of Endorsement X the Policy states: "[t]he LIMITS OF INSURANCE as shown in the Declarations shall apply in excess of the "Self Insured Retention" showed in the Declarations. You agree to assume payment of the "Self Insured Retention"." (Docket Nos. 164 ¶ 6; 249-1 ¶ 5).

16. SECTION IV – CONDITIONS of Endorsement X establishes that:

> In the event of bankruptcy or insolvency of any insured, or the inability, failure, or refusal to pay the "Self Insured Retention" by any insured, we will not be liable under the policy to any greater extent than we would have been liable had the insured not become bankrupt or insolvent or had such inability, failure or refusal not occurred, and this policy will not apply as a replacement for the "Self Insured Retention". You will continue to

> be responsible for the full amount of the
> "Self Insured Retention" before the limits of
> insurance under this policy apply. In no case
> will we be required to pay the "Self Insured
> Retention" or any portion thereof.

(Docket No. 249-1 ¶ 6).

17. As an additional condition, Endorsement X requires:

> The "Self Insured Retention" under this policy
> must be satisfied by actual payments by you.
> The "Self Insured Retention" shall not be
> satisfied by payments by the insured of any
> deductible of any other policy or payments
> made on behalf of the insured by any other
> insurer, person or entity. The "Self Insured
> Retention" under this policy shall not be
> satisfied by any insurance coverage
> whatsoever. In the event that "bodily injury",
> "property damage" and/or "personal and
> advertising injury" covered by this policy is
> also covered by any other insurance, even if
> such other insurance is provided by us, the
> insured must make actual payments of the "Self
> Insured Retention" under this policy without
> regard to whether the insured must pay other
> "Self Insured Retentions" under any other
> policy even if such other policy is issued by
> us and even if the damages claimed are deemed
> to have been caused by one "occurrence".

Id. ¶ 7.

18. Per Endorsement M, titled the "No Drop Down Endorsement"

ACE's liability "shall not be increased by the refusal or

inability of the insured to pay its Self-Insured Retention

(or retained limit) or by the refusal or inability of the

insured to pay, whether by the Reason of Insolvency,

Bankruptcy or otherwise." (Docket No. 87-1 at 72).

19. In the event of insolvency, Endorsement V, titled the

"Insolvency Clause," clarifies:

> Notwithstanding any of the terms of this
> policy which might be construed otherwise,
> this policy shall drop down only in the event
> of reduction or exhaustion of the underlying
> limit and shall not drop down for any other
> reason, including, but not limited to,
> uncollectibility [sic] (in whole or in part)
> of any underlying limits. The risk of
> uncollectibility [sic] of such Underlying
> Limits (in whole or in part) whether because
> of financial impairment or insolvency of an
> underlying circumstances insured or assumed by
> the insurer.

(Docket No. 249-1 ¶ 9).

20. With regards to how ACE's policy interacts with other
insurance policies, the Policy provides:

> If other valid and collectible Insurance is
> available to the insured for a loss we cover
> under this policy, this policy is in excess of
> and will not contribute to the other insurance
> except if the other insurance is written as
> excess insurance over the insurance provided
> by this policy. When both this insurance and
> the other insurance apply to a loss on the
> same basis, whether primary, excess,
> contingent, or any other basis, then we will
> share with that other insurance by the
> following method:
>
> a. If all of the other insurance permits
> contribution by equal shares, we will follow
> this method also. Under this approach, each
> insurer contributes equal amounts until it has
> paid its applicable limit of insurance or none
> of the loss remains, whichever comes first.
>
> b. If any of the other insurance does not
> permit contribution by equal shares, we will
> contribute by limits. Under this method, each
> insurer's share is based on the ratio of its
> applicable limit of insurance to the total

    applicable  limits  of  insurance  of  all
    insurers.

(Docket Nos. 87-1 at 22; 249-1 ¶ 10)

21. On July 2, 2017, PREPA filed a petition under Title III of
PROMESA with the United States District Court for the
District of Puerto Rico (Bankruptcy Case No. 17 BK 4780-
LTS). (Docket No. 249-1 ¶ 15).

22. Although the Court issued an order staying proceedings
against PREPA, on April 24, 2018, PREPA and Plaintiffs agreed
to a "Stipulation Modifying the Automatic Stay between the
Puerto Rico Electric Power Authority, Dino Dimario and Cheryl
Steele" (the "Stipulation"). (Docket No. 249-1 ¶¶ 18-19).

23. Pursuant to the clear terms of the Stipulation:

    The Title III Stay was modified solely to the
    limited extent necessary to enable the
    Prepetition Action to proceed to judgement
    before the District Court; provided, however,
    the Title III Stay shall continue to apply in
    all other respects to the Prepetition Action,
    including, but not limited to, the execution
    and enforcement of any judgement, injunction,
    any claims for money damages, and provisional
    remedies against PREPA, if any, or any other
    Title III Debtor.

    It is expressly understood by the Requesting
    Parties that nothing contained in this
    Stipulation shall: (a) require PREPA or any
    other Title III Debtor to satisfy or pay any
    monies allegedly owed to the Requesting
    Parties regarding the claims asserted in the
    Prepetition Action; or (b) constitute a
    determination of any type of liability or
    monetary claim of any kind as to any other
    Title III Debtor.

(Docket No. 249-1 ¶¶ 20-21; 249-2).

## IV. APPLICABLE LAW

### A. Declaratory Judgment

The Declaratory Judgment Act ("DJA") provides that:

> In a case of actual controversy within its
> jurisdiction ... any court of the United
> States, upon the filing of an appropriate
> pleading, may declare the rights and other
> legal relations of any interested party
> seeking such declaration, whether or not
> further relief is or could be sought. Any such
> declaration shall have the force and effect of
> a final judgment or decree and shall be
> reviewable as such.

28 U.S.C. § 2201.

It is an enabling act conferring "discretion on the Courts rather than an absolute right upon the litigant." Prime Venture Corp. v. Fennix Glob. Holdings, Inc., 2020 WL 3244333, at *2 (D.P.R. 2020) (quoting DeNovelis v. Shalala, 124 F.3d 298, 313 (1st Cir. 1997)). The Supreme Court has held that "case of actual controversy" refers to "the type of 'Cases' and 'Controversies' that are justiciable under Article III" of the Constitution. MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007). Thus, the declaration "must fall within 'the type of relief that Article III allows courts to give—'decree[s] of a conclusive character' adjudicating adverse parties' actual rights and interests.'" WM Cap. Partners 53, LLC v. Barreras Inc., 373 F. Supp. 3d 350, 360 (D.P.R. 2019) (quoting In re: Financial Oversight & Mgmt. Bd. For

P.R., 916 F.3d 98, 111 (1st Cir. 2019)). Declaratory judgment is
favored when the judgment: (1) serves a useful purpose in
clarifying and settling the legal relations in issue, and (2) will
terminate and provide relief from the uncertainty, insecurity, and
controversy giving rise to the proceeding. *See* Cadillac Unif. &
Linen Supply, Inc. v. Cent. Gen. de Trabajadores, 2020 WL 4289389,
at *6 (D.P.R. 2020), report and recommendation adopted sub nom.
Cadillac Uniforms & Linen Supply, Inc. v. Cent. Gen. de
Trabajadores, 2020 WL 4289365, at *1 (D.P.R. 2020) (quotation
omitted). It seeks to limit avoidable losses and the unnecessary
accrual of damages and to provide a party threatened with liability
an early adjudication without waiting until an adversary begins an
action after the damage has accrued. Id. (quotation omitted).

**B. Interpreting Insurance Policies under Puerto Rico Law**

The Insurance Code of Puerto Rico (the "Insurance Code")
governs insurance contracts, known as policies, in Puerto Rico.
*See* P.R. Laws Ann. tit. 26, §§ 1101-1137. Under said Insurance
Code, insurance contracts are to be "construed according to the
entirety of its terms and conditions as set forth in the policy,
and as amplified, extended, or modified by any lawful rider,
endorsement, or application attached to and made a part of the
policy." Id. § 1125. Generally, "insurance contracts are
considered contracts of adhesion that are liberally interpreted in
favor of the insured." Metlife Capital Corp. v. Westchester Fire

Ins. Co., 224 F. Supp. 2d 374, 382 (D.P.R. 2002) (citing Quiñones Lopez v. Manzano Pozas, 141 D.P.R. 139, 155 (1996); Rosario v. Atl. Southern Ins. Co., 95 D.P.R. 759 (1968)).

When the Insurance Code fails to provide the "interpretative approach" required for a particular controversy, courts look to the Puerto Rico Civil Code for a supplemental source of law guiding contract interpretation. *See* Marina Aguila v. Den Caribbean, Inc., 490 F. Supp. 2d 244, 248 n. 5 (D.P.R. 2007). The Puerto Rico Civil Code dictates that "[if] terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed." P.R. Laws Ann. tit. 31, § 3471. In such cases, "the court should confine itself to a literal application of the unambiguous terms of the contract." Gonzalez v. John Hancock Mut. Life Ins. Co., 927 F.2d 659, 660 (1st Cir. 1991) (internal quotations and edits omitted). "Under Puerto Rican law, an agreement is 'clear' when it can 'be understood in one sense alone, without leaving any room for doubt, controversies or difference of interpretation[.]'" Executive Leasing Corp. v. Banco Popular de Puerto Rico, 48 F.3d 66, 69 (1st Cir. 1995)(quotation omitted); *see also* Heirs of Ramírez v. Superior Court, 81 P.R.R. 347, 351 (1959). In terms of insurance contracts in particular, the District of Puerto Rico has held that although ambiguities arising from an insurance policy should "be resolved in the manner least favorable to the insurer […] this

praxis **does not compel or require courts to interpret a clear,
unambiguous clause that favors the insurer in a manner that would
benefit the insured.**" Metlife Capital Corp., 224 F. Supp. 2d at
382 (emphasis added).

It is worth noting that "[a]mbiguity does not exist simply
because the parties disagree about the proper interpretation of a
policy provision." Hoffman Garcia v. Metrohealth, Inc., 246 F.
Supp. 3d 527, 530 (D.P.R. 2017). Instead, it "may be found where
the policy's language is susceptible to more than one rational
interpretation." Id. (quoting Clark School for Creative Learning,
Inc. v. Philadelphia Indem. Ins. Co., 734 F.3d 51, 55 (1st Cir.
2013)). Moreover, whether an insurance policy's terms, conditions,
and exclusions are clear and unambiguous is a matter of law for
courts to determine. *See* Marina Aguila, 490 F. Supp. 2d at 249
(quoting Littlefield v. Acadia Ins. Co., 392 F.3d 1, 10 (1st Cir.
2004)).

**C. Puerto Rico's Direct-Action Statute**

Section 2003 of the Insurance Code, known as Puerto Rico's
"direct action statute" regulates lawsuits against an insurer,
providing in part:

> Any individual sustaining damages and losses
> shall have, at his option, a direct action
> against the insurer under the terms and
> limitations of the policy, which action he may
> exercise against the insurer only or against
> the insurer and the insured jointly. The
> direct action against the insurer may only be

> exercised in Puerto Rico. The liability of the
> insurer shall not exceed that provided for in
> the policy, and the court shall determine not
> only the liability of the insurer, but also
> the amount of the loss. Any action brought
> under this section shall be subject to the
> conditions of the policy or contract and to
> the defenses that may be pleaded by the
> insurer to the direct action instituted by the
> insured.

P.R. Laws Ann. tit. 26, § 2003(1). This statute "merely permits an injured party to maintain against the insurer the same claim it could pursue against the insured." Torres-Troche v. Municipality of Yauco, 873 F.2d 499, 502 (1st Cir. 1989) (citing Fraticelli v. St. Paul Fire & Marine Ins. Co., 375 F.2d 186 (1st Cir. 1967)). In other words, "the direct action statute **does not confer any additional rights against the insurer than those already held by the insured.**" In re San Juan Dupont Plaza Hotel Fire Litig., 789 F. Supp. 1212, 1217 (D.P.R. 1992) (emphasis added). Therefore, an "insurer's liability arises from and is dependent on its contractual obligations to the insured." Torres-Troche, 873 F.2d at 502.

### V. DISCUSSION

### A. Plaintiffs' Requests for Declaratory Judgment

Plaintiffs request that the Court issue declaratory judgment on four distinct grounds. The Court shall address each request below.

  i. Both PREPA and the Commonwealth of Puerto Rico are named
     insureds under the Policy

The Policy identifies the Commonwealth of Puerto Rico as an
"extended" or "broad form" named insured. (Facts ¶¶ 2-3). ACE
neither contests nor accepts this fact, rather assuming it *arguendo*
for different defenses in their motions. Per the Policy's clear
terms, ACE insures the Commonwealth of Puerto Rico "in the same
manner as though a separate policy had been issued to [it]." (Fact
¶ 4). Thus, both PREPA and the Commonwealth of Puerto Rico are
necessarily named insureds under the Policy.

  ii. The Court need not determine whether the Policy provides
      coverage for direct actions

Pursuant to Section 2003 of Puerto Rico's Insurance Code,
P.R. Laws Ann. tit. 26, § 2003(1), Puerto Rico is a "direct action"
jurisdiction, that allows "an injured party to maintain against
the insurer the same claim it could pursue against the insured."
Torres-Troche, 873 F.2d 499, 502 (1st Cir. 1989). Therefore, there
is no legal uncertainty that warrants declaratory judgment for
clarification as to whether the Policy allows for direct actions.
*See* Cadillac Unif. & Linen Supply, Inc., 2020 WL 4289389, at *6.

  iii. The Policy does not drop down in the event of just a
       reduction of the underlying limit nor due to payments
       made under other insurance policies

Plaintiffs ask that the Court declare that the Policy will
drop down in the event of the reduction or exhaustion of the
underlying limit, such as aggregate limit of the underlying

insurance provided by MAPFRE to the Commonwealth of Puerto Rico.
The Policy explicitly states that coverage is only provided *in
excess* of the SIR, not the mere *reduction* of the SIR. (Fact ¶ 15).
The Policy specifies that the SIR "shall not be satisfied by
payments by the insured of any deductible of any other policy or
payments made on behalf of the insured by any other insurer, person
or entity. The [SIR] under this policy shall not be satisfied by
any insurance coverage whatsoever." (Fact ¶ 17). Rather, the SIR
"must be satisfied by actual payments by [the insured]." Id. Thus,
contrary to Plaintiffs' assertions, the Policy does not drop down
due to a reduction in the underlying limit nor due to payments
made by other insurance policies.

> iv. The Policy Requires a $1,000,000 deductible and
> $1,000,000 SIR

Lastly, Plaintiffs ask the Court to find that in the event of
drop down due to the reduction or exhaustion of the underlying
limit, such as aggregate limit of the underlying insurance, the
amount of damages need not exceed $1,000,000. However, as discussed
above, this described drop down cannot occur. Furthermore, it is
worth noting that coverage under the Policy for bodily injury or
property damage is subject to a $1,000,000 deductible in excess of
the $1,000,000 SIR. (Facts ¶¶ 10-11).

**B. ACE's Liability**

As noted above, after the filing of the pending cross-motions for summary judgment, the Court has since granted PREPA's own *Motion for Summary Judgment*, thereby dismissing with prejudice the totality of Plaintiffs' claims against PREPA. (Docket No. 311). Therefore, Plaintiffs can no longer maintain a viable claim against ACE in its capacity as PREPA's insured. *See* <u>Torres-Troche</u>, 873 F.2d 499, 502 (1st Cir. 1989). *See also* <u>Reyes-Lopez v. Misener Marine Const. Co.</u>, 854 F.2d 529, 530 n. 2 (1st Cir. 1988) ("Under 'liability insurance' policies such as the three policies in this case, the insurer is liable only if its insured would be liable.") (citing 12 Couch on Ins. § 45:28). However, in addition to insuring PREPA, the Policy insures the Commonwealth of Puerto Rico "in the same manner as though a separate policy had been issued to [it]." (Fact ¶ 4). Thus, the Court must analyze Plaintiffs' claims against ACE in its capacity as insurer of the Commonwealth of Puerto Rico.

In its *Motion for Summary Judgment*, ACE asserts that Plaintiffs' claims against it as the insurer of the Commonwealth of Puerto Rico should be dismissed because no obligation to pay on behalf of the Commonwealth will arise. (Docket No. 249 at 15-16). Moreover, they ask for dismissal of Plaintiffs' claim for their emotional trauma and mental anguish as they are not covered under the Policy. <u>Id.</u> at 16-17. The Court will begin with the latter.

The Policy provides coverage for both bodily injury liability and property damage liability. (Fact ¶ 11). In its relevant part, the Policy defines "bodily injury" as "bodily injury sickness or disease sustained by a person, including death resulting from any form of these at any time" as well as the resulting "**mental anguish sustained by someone who has suffered a covered 'bodily injury'**". (Fact ¶ 12) (emphasis added). Per this language, the Policy unambiguously limits coverage for mental anguish to that experienced by the *same person* who endured the covered bodily injury. Furthermore, a leading treatise on Insurance law explained that while "[t]he majority view is that humiliation and emotional distress, mental pain and anguish, spoliation of evidence, or injury to reputation **do not** constitute 'bodily injury.' […] damages for emotional injury are recoverable when such damages are the result of physical injury." 9 Couch on Ins. 3d § 126:33; *see also* Ford v. Mahindra USA, Inc., 546 F. Supp. 3d 509, 514-15 (W.D. La. 2021) (analyzing an analogous clause in an insurance policy and finding "where an insurance policy requires an injury that is physical in nature to trigger 'bodily injury' coverage, and the claimant has not suffered a physical harm, mental anguish does not constitute bodily injury.").

While the Policy also specifies that "damages because of 'bodily injury' include damages claimed by any person or organization for care, loss of services or death resulting at any

time from the 'bodily injury'[,]" this **does not equate** to coverage

for any individual's mental anguish. (Fact ¶ 14). When faced with

interpreting an identical insurance policy provision in <u>Nationwide</u>

<u>Mut. Fire Ins. Co. v. Creations Own Corp.</u>, the United States

District Court for the Middle District of Florida determined that:

> [T]o find that "care" or "loss of services"
> resulting  from bodily injury encompasses  [a
> father]'s emotional distress [due to his son's
> physical damages] would stretch the Policy
> beyond reasonable interpretation. The Policy
> expands the definition of bodily injury to
> include expenses related to the care of the
> injured person or loss of services resulting
> from the injury. It does not expand the
> definition   of bodily injury to include the
> distress that a parent suffers as a result of
> watching a child experience pain.

<u>Nationwide Mut. Fire Ins. Co. v. Creations Own Corp.</u>, 2012 WL

12895642, at *5 (M.D. Fla. 2012), <u>aff'd sub nom.</u> <u>Nationwide Mut.</u>

<u>Fire Ins. Co. v. Creation's Own Corp.</u>, 522 F. App'x 589 (11th Cir.

2013). The Court simply cannot reach a different conclusion here.

Thus, Plaintiffs claims for mental anguish and emotional

trauma caused by their son's death, not their own bodily injury,

are not covered by the Policy. Plaintiffs' only remaining claims

are for reimbursement of funeral and medical expenses for their

son in excess of $15,000.00. (Docket No. 99 ¶¶ 41, 43). Although

Plaintiffs' funeral and medical expenses are unlikely to amount to

the threshold $1,000,000 self-insured retention and/or deductible

required under the Policy, no evidence to that effect has been

presented. (Facts ¶¶ 10, 11). Therefore, at this juncture, the Court cannot dismiss Plaintiffs' claims seeking reimbursement of funeral and medical expenses from ACE.

### VI.  CONCLUSION

Plaintiffs' *Motion for Summary Judgment* at Docket No. 163 requesting Declaratory Judgment pursuant to U.S.C. §§ 2201-2 is **DENIED IN PART** and **GRANTED IN PART.** It is hereby **ORDERED** and **ADJUDGED** that both PREPA and the Commonwealth of Puerto Rico are named insureds under the Policy.

On the other hand, ACE's *Motion for Summary Judgment* at Docket No. 249 is **GRANTED IN PART and DENIED IN PART.** Plaintiffs' claims against ACE in its capacity as PREPA's insurer are hereby **DISMISSED WITH PREJUDICE.** Furthermore, Plaintiffs' claims against ACE for their emotional damages and mental anguish are also hereby **DISMISSED WITH PREJUDICE.** However, Plaintiffs' claims for reimbursement of funeral and medical costs against ACE in its capacity as insurer of the Commonwealth of Puerto Rico remain pending.

**IT IS SO ORDERED.**

In San Juan Puerto Rico, this 18th day of January 2023.

                    S/ RAÚL M. ARIAS-MARXUACH
                    United States District Judge